May it please the Court, the Medicaid Act requires the state and the federal government to jointly agree, in advance, how much to pay for each of the hundreds of different medical services Medicaid covers. Of necessity, these carefully calibrated rates can't ensure every service will always be available to every beneficiary. And here, despite the state's extensive efforts, no provider is willing, at the current rates, to furnish Karen Vaughn with home health care services, even though she's eligible for Medicaid, and even though Medicaid covers these services. So could I ask you about that? Mr. Hudson, this is probably a very simplistic question, but this is a complex program. I wasn't 100% clear why the state takes the position that patching together two or three such programs would not, in the aggregate, meet Ms. Vaughn's needs. It seems that the district court, at least, was under the impression. Good morning, Judge Bower. It seems that the district judge thought that this sort of stacking of programs, or mix and match, or however you put it, was possible. And I would just like you to explain to me why, for instance, she couldn't have, you know, 16 or 18 hours a day of ordinary Medicaid services, and the rest under one of the state's own programs, such as CHOICE. I think there are two important points on that, Your Honor. First, with respect to mixing and matching different Medicaid programs, the state certainly has no opposition to that. That's something that happens with some frequency. For example, having a state plan, the normal state Medicaid plan, covering a certain number of home health care hours, and then the aged and disabled waiver covering the remaining hours, that's something that happens with some frequency. The state's not opposed to that. What the state is opposed to is using the CHOICE program, which is, under state law, specifically barred from being used to cover services that Medicaid itself covers. Now, I want to draw a distinction, and I think this is something that the district court may have missed. Under state law, there is no problem using the CHOICE program together with Medicaid. So the CHOICE program can be used by Medicaid beneficiaries. There's no problem there. But when Medicaid covers a particular service, here, home health care services, state law bars using the CHOICE program to pay for those services. And that's the problem here. And I think, crucially, with respect to the CHOICE program, Ms. Vaughn never included a request in her, initially, even before she filed her complaint, that the CHOICE program be modified in some way to allow her to use it. That claim was not presented in her complaint, nor was it briefed at all at summary judgment. The CHOICE program was raised for the first time at the remedy hearing. And so, the CHOICE program is a red herring here. It has nothing to do with the liability determination, and it can't affect the remedy for the reasons that we point out in the brief, that enjoining the state to use the CHOICE program would be broader than the legal justification for the injunction in the first place, and that would make the injunction unlawful. And that's precisely, if I can move to what I think is the most straightforward ground for reversal, the district courts, the district court here found the state liable for failing to grant two modifications that Ms. Vaughn requested. One, to self-direct her care, and two, to hire unskilled providers. And if the district court were to have issued an injunction requiring the state to grant those modifications, the state would still have an argument on liability, but that injunction would be lawful. But instead, the district court issued a much broader injunction that simply requires the state... Counsel, this is Judge Easterbrook. I want to make sure that I understand what you just said, because that was one of the important questions for me. Whether it would be lawful for the district court, using 28 CFR 35170B7i, to order the state to permit the use of unskilled providers as a reasonable modification under that regulation. And I understand what you just said, to say, yes, that would be a lawful thing, but of course, that's not what the district court ordered. Yes, Your Honor. I want to make a crucial point of clarification. In the state's view, that would be lawful as a matter of remedies law. Now, the state thinks that that would still be unlawful, because such an order would be unreasonable and would constitute a fundamental alteration of the program under that regulation. But there would be no problem as a matter of equities law, with issuing a narrow injunction of that order. I understand you might debate whether that would be reasonable, but one further question about that possibility, and I will then ask Ms. Edwards whether the plaintiff is still making, still asking for that. At what rate of reimbursement would the unskilled providers be reimbursed? They would be reimbursed at the unskilled rates. And I don't have that directly in front of me, Your Honor, but the... Well, we're not a rates tribunal. I just need to know what the basic answer is. Yes, it would be the unskilled rates. Okay. Thank you. So, could I go back to your, maybe we're just jumping around a bit, but back to your point about the scope of the injunction. In some ways, the problem with this injunction isn't that it's too broad, it's that it's very specific. And so, you would think that perhaps the state could be held in contempt if a service was provided 30 minutes after the schedule that the district court seems to have cut and pasted from the record. And I think the district court was trying to say that the state isn't joined to allow her to receive her benefits from the state in a home setting. And maybe there's more than one way to do that. I don't think she wanted to tie the state's hands. So, I find it a little curious that you seem to think that an injunction that just said she is entitled to self-direct her care and she is entitled to be exempt from the state's otherwise existing licensure requirements and requirements, for example, that ventilator care has to be done by somebody with certain qualifications and those sorts of things. So, I don't see why the injunction is unclear to the state. Whether it's something that is within the scope of Indiana's Medicaid program is a different question. Whether this is just such a major shift from the program that it's a fundamental change and shouldn't be ordered is another question, I think. Well, two things on that, Your Honor. First, there are two separate problems with the injunction and neither of them have to do with the lack of vagueness. The first is overbreadth. So, there were two justifications for the injunction, a failure to grant two specific modifications and an injunction, as this court has repeatedly held, the injunction cannot be broader than the legal justification for its entry. And requiring the state to go beyond granting those two modifications is unlawful and that has nothing to do with clarity. Can I just ask, though, reading the district court's opinions as a whole, it seems to me that all the court was trying to say was that Ms. Vaughn is entitled to receive her services at home and the state isn't joined to put her in a home setting with appropriate care. And I thought that reading that injunction, it was simply saying if you want to know how to comply, here's one way, but you're also free to comply other ways, too. And I don't know why that's broader than what she was asking for. She just wants her services at home, right? No, I don't think that's right, Your Honor. I think there are two important points here. The first is that there were only two theories under which she proceeded and those were the two modifications we mentioned earlier. And I don't think the district court went further in saying that she has an absolute right to receive these home health care services, period. And if the district court were to have said that, it would be wrong. The ADA does not impose an absolute entitlement, as this court noted in Stimel and its other ADA cases. The ADA merely requires the state to provide modifications if they are, one, reasonable, and two, don't constitute a fundamental alteration. And there were two such modifications that were issued throughout this case, and the district court rested its decision on its conclusion that those two modifications were reasonable and would not constitute a fundamental alteration. And longstanding rules of equity say the district court cannot go any further than requiring the state to grant those modifications. It would be different if the ADA did impose a categorical requirement to provide home health care services no matter what. If the state did, then an injunction requiring the state to do that might be appropriate, at least as a matter of equitable law. But this court has long held that the ADA does not impose such a categorical limitation, and appropriately so, because the Supreme Court in Olmstead held precisely that. So, can I also, let me throw in another thought, and then I actually have a random question that you can put to one side if you need to. It's my understanding from the ADA and from Olmstead, etc., that the ADA and the Rehabilitation Act, which are roughly the same here, explicitly identify unjustified segregation of persons with disabilities as a form of discrimination, where segregation means that you've been put in a nursing home or you're not in a community setting. So, doesn't that impose on the state a pretty strong duty to avoid that type of segregation, if at all possible? Your Honor, I absolutely agree. I think that's right. But I think the crucial point is that the ADA prohibits unjustified segregation, and it defines unjustified segregation as segregation that can be avoided by reasonable accommodations. That is, accommodations that are both reasonable and don't constitute a fundamental alteration. So, that's the crux of this case. And this Court has recognized that in other cases as well, that the ADA's reasonable accommodation regulation is in many ways similar to ADA Title I and ADA Title III, that they're about, a plaintiff comes in, they say, I would like to receive care in a particular manner in my home or out in the community, and state regulations are preventing me from doing so in some manner, and I'd like you to modify them in a particular way so that I can receive the care that I'd like. And the ADA says, if those modifications are reasonable, wouldn't constitute a fundamental alteration, then the state has to provide them. And that's exactly how this case has been litigated. And the crucial point is there were two modifications at issue here, and even if the Court were to agree with the District Court that the state should have granted those two modifications, the injunction should not have gone further than requiring the state to grant them. And... Could I ask one other question? I couldn't tell. I realize that Ms. Vaughn has been receiving these services since 19... some sort of services from Indiana since 1976, it looked like, when she became... when she was afflicted with quadriplegia. Is she forever going to be under Medicaid, or does there come a time that the state transitions care over to the Medicare system, and does that make any difference here? I believe, Your Honor, that eventually the care will be shifted to Medicare, but I... Unfortunately, Your Honor, I can't confirm that. I can... I can try to find an answer and get back to you on rebuttal on that. That's okay. I mean, I'm just trying to figure out if she's been... if she's been getting care for 40 years. I was just trying to figure out how old she is and whether this is imminent or not. No, understood. Yes. And I think it's worth pointing out that she began... she'd been receiving care under the state's Medicaid program since at least... or since at least 1981, was receiving home health care services. And it was in 2012 that she had a tracheostomy and began needing a ventilator at night. And that's when... that's when things got a bit more complicated. She received home health care until 2015, and the... for October 2015, her home health care provider stopped providing full coverage services. And then when she was hospitalized in January 2016, that's when... that's when the difficulties first began. Yeah, and that struck me as weird, to tell you the truth. You know, she's... that's when it all unravels. She's hospitalized for pneumonia in January 2016. She's only in the hospital for a week, but the entire system seems to fall apart. And it's hard for me to understand how Indiana was keeping her at home the week before the pneumonia, and it couldn't put her back at home the week afterwards. And the answer there, Your Honor, is very simple, that the provider simply refused to provide care. And under the Medicaid regulations, the state, unfortunately, can't force the provider to resume care. And so, I think it's worth noting that in January 2016, the same month that Ms. Vaughn was admitted to the hospital, her case manager and FSSA official... excuse me, Indiana Family, State, and Social Services Administration, state officials came to the hospital to learn more about her situation and to see if they could help find a home health care provider. So that very same month. And then in February, state officials called 56 different providers trying to find someone who would provide care, and none of them were willing to do so. And it appears that the principal problem was that most of these providers simply didn't have the volume of staff necessary to commit. And that takes me back to the question, you know, why did it have to be all through one? But I will also, just as a courtesy, tell you, you had indicated five minutes for rebuttal, and you're down to four minutes at this point. So it's up to you. If you'd like to save a little, now's a good time. Thank you, Your Honor. If the court doesn't have any questions at the moment, I'm happy to reserve the rest of my time for rebuttal. I hear none, so that would be fine. Thank you. So we will turn to Ms. Edwards. Thank you, Your Honor. Good morning. May it please the court, my name is Elizabeth Edwards, one of the attorneys for the plaintiff at Pauley, Ms. Karen Vaughn. Before the institutionalization that is the subject of this case, Ms. Vaughn successfully lived in the community with her disabilities using Medicaid services for over 35 years. In January 2016, as the court already pointed out, her one-week hospitalization turned into a three-year institutionalization that was against her wishes, contrary to the advice of her physicians, and to the detriment of her health and well-being. But Ms. Edwards, what is the state supposed to do if it shops a case around, as they seem to have done repeatedly with Ms. Vaughn's case, and the providers just say, we don't want to take this case? I don't see, at some point, they don't have the power to compel service. The state does have an affirmative obligation under the ADA to provide for her in-home services, and it certainly was in its own powers to design a program that will ensure there are providers and programs that can meet her needs. The court in Steinmull sort of addressed that the state is the designer of its own program, and here, part of the design of the program is also, how do you make a program that has the provider, if necessary, to make sure that community-based services necessary to meet the obligations of the ADA Rehabilitation Act are met? Ms. Edwards, if I understand it correctly, in the district court, Vaughn's argument was there were two things the state could do. One was permit her to have self-directed care using people other than registered nurses. The other was to raise the rates, and I assume at a high enough rate, it's easy to attract care. The second of those is highly problematic under Armstrong, and the district court didn't do it, at least expressly, and the district court didn't do the former either. What is it that the plaintiff now wants? Does the plaintiff still want the possibility of self-directed care? Ms. Vaughn specifically asked in her April 2016 letter for any accommodations that would provide her services at home. As she's mentioned in her deposition, she would be open to anything that gets her home, and her request for accommodations started off with a broad request and then included some ideas from her about how she could change the program. One reason I'm asking this question is because your brief doesn't pursue this possibility at all. I don't see an argument in the brief about self-directed care, about what it would mean concretely, about what kind of providers would be entailed, what kind of rates they would be paid, and whether the plaintiff is willing to waive liability if it turns out that people who aren't registered nurses bungle the job. I mean, those are critical questions here, are they not? Your Honor, the brief does address the nurse delegation issue, which is largely sort of the heart of the self-direction, and Ms. Vaughn would also, part of what she was requesting was saying, if you'll just allow me to self-direct nursing care, then I might also be able to pay the rate for nurses. But the self-direction part of this was fully briefed. She certainly has indicated and said... It's not only briefed in this court. We look at the appellate briefs to determine what litigants want, and the whole business about use of unskilled care is not briefed in this Your Honor, I don't mean to get into a disagreement about whether it was briefed, but we did discuss how other states do nurse delegation, that nurse delegation is done by other states, that she wants nurse delegation. In fact, we addressed the specter of safety on page 15 of our brief about nurse delegation, and said that the Nurse Practice Act allows it. Ms. Vaughn certainly says, and is supported by her position, that nurse delegation, which is the practice of allowing others to provide nursing care that are not licensed, is something that she wants and desires. And the third part of my question, is Vaughn willing to waive liability if the use of semi-skilled care leads to problems? Or is she going to come back and... The answer is yes. Okay. Yes. Yes. What Ms. Vaughn desires is to get home pretty much any way that she can, and here, her doctors have said, having unskilled workers provide care is appropriate for her, and she is more than capable, as she's indicated before, of directing people to provide her care, as she is alert and cognizant of her own needs. So, Ms. Edwards, one thing that concerns me is looking at the place where this case is right now. It seems to be in an unsustainable posture. So, the state used mechanisms to check with the pool of providers it knew about. Now, maybe that was too narrow a search, maybe it wasn't, but they did certainly contact a lot of people, and they did numerous times, and they came up with no's, and so they are now, as I understand it, simply contracting with purely state funds, with this company, Tender Care, and at a very high expense to the state, which may be fine for Ms. Vaughn, but if you generalize, if you say, under the Medicaid Rehabilitation Act, the state has this obligation, that suggests to me that the Medicaid pay caps have just gone out the window, that there is, in fact, no meaningful cap that the state can put on what it's willing to do, and that's of great concern to me, after Armstrong and the other cases that we have, and so you might just say, well, it's the state needs to think about the legal regime under which this is taking place, and that worries me. Brenda, the Armstrong concern, I would like to point out that certainly Armstrong is about a different provision of the Medicaid Act, it's about A30A and not A8, which is the provision in question here. The other point I would like to make is that the ADA does require, and says that there may be modifications that cost the state money. I think what is critical to understand in this case is that the state has the opportunity to present a defense about costs, and it did not, and certainly states, and that was something they could have or should have done, they indicated that there was no expectation that there was a problem in this case. Now, they have been complaining about that. Excuse me, could I just interject with something, because one of the things that's a little perplexing also about this case is if you were to look at the record as of the time the district court grants summary judgment, the state really hasn't said much of anything at that point. They look at one policy manual and did very little to explain to the district court what the problems were that it was facing, what it was trying to deal with. Then, by the time you get to the remedy stage, the state has stepped up to the plate, and it's brought in quite a bit more detail. So the record we're looking at at the remedy stage seems to me to be a much more complete one, and so one of my procedural questions is, do we take the record as it finally was once everything was said and done at the remedy stage, or do we evaluate the decision to grant some kind of injunction based only on what was presented at the summary judgment stage? Your Honor, we would argue that the state has an obligation to defend its case at the summary judgment stage, and we should be evaluating the court's decision for summary judgment based on the record before it. In that record, the state had provided very little information, and as Your Honor pointed out, really only pointed to policies as to why the state could not provide mislauncher services or do anything more than calling providers. But as this court has held in Simel and in Radishvili and in other cases, the state can't just rely on its own policies and procedures. The fact that the state failed to prove its own defense should not be held against Ms. Vaughn, and they have waived many of those defenses now since they did not fully develop them at the summary judgment stage. But what do you do with the fact that our review at this point is de novo, it's summary judgment, the injunction, there's a discretionary aspect, but certainly the basic obligations were decided as a matter of law. And I fully take the point that if the state just says, well, it's our policy not to do this, that's a pretty weak response. If the state, as it now seems to be doing, is pointing to aspects of the Medicaid program itself, it's pointing to regulations, it's pointing to the power of CMS to approve or not various aspects of the program. I'm not sure whether you think the district court can issue an injunction telling the state to go back to CMS and try for a different program, or whether you're just saying the state needs to act outside the ambit of the Medicaid program altogether. But certainly the law is laid out in much more detail at this point. I think that the district court's discussion in her final remedy phase sort of indicates both where she was on what the state had presented, and also I would say correct the state's interpretation that this is about two individual accommodation requests, that really the basis of the court's decision, as indicated on the short appendix, page 49, that basically the court concluded the defendant's practices and policies resulted in the violations, and their failure to do anything more or try anything. And I think even at the remedy phase, the judge cited the bureaucratic quagmire the state presented, and the failure of the state to even really have a meeting to help figure out why Ms. Vaughn could or could not get services, and instead they simply called people. I think even at that stage, even though there was more information presented about the various programs the state had available, that almost in some ways worked against the state, because it said, look, there are all these other things the state could be doing, and it's still not doing those things. Therefore, the injunction is almost in some ways more necessary now, because the state acknowledges it could be doing a lot of other different things, and it still isn't doing those, and still isn't holding a meeting to talk about what it could be doing to solve the problem. I mean, certainly the ADA requires to go, it does not, it is a separate and distinct provision from the Medicaid Act, and it has consistently required states to go beyond the Medicaid Act. The Medicaid Act may be the most efficient way for states to provide community-based services, but it's not, they are not sort of concurrent obligations in the sense that the state is limited under the ADA to what it can do under the Medicaid Act. Well, that's true, but of course, your opponent points out several times that this isn't an open-ended obligation on the part of the states, even for purposes of the ADA, that is beyond the scope of the state's responsibility, and there is some reasonableness constrained on what the state can be asked to do. Yes, Your Honor, but the state never actually said anything about it having a working OMFED plan, and in Ratajkowski and in other courts have indicated, and we cited this in our brief with the Brown vs. District of Columbia case, that if a state does not have a functioning OMFED plan, the fundamental alteration defense is to be drawn very narrowly, and therefore it's a very high bar for the state to meet, that if they're not already showing that they are making sure people with disabilities are not unnecessarily segregated in the community as Ms. Vaughn was, that they have a very high bar to meet about what is a fundamental alteration, and I would submit to this court that the state didn't even come close to showing any type of defense as required by Stimel in terms of showing that somehow services or other resources would be taken away from people with disabilities, which is that third prong, which is how Stimel interpreted the third prong of the OMFED test, and there's no real evidence that the state is making that point. And in addition, Ms. Vaughn, she showed through very specific information as to why her accommodations that she requested beyond the broad accommodation request to live in a community, which is a separate obligation under OMFED, that her individualized reasonable accommodations requests were reasonable. She had her evidence from her doctors and support from others, and the state just pointed to its own policies, which is insufficient. The OMFED courts have consistently required that a specific factual analysis be provided when a person is asking for an accommodation, and that's from Townsend v. Capum and a few other courts. So is it your position that it's inherently unreasonable for states to say that they will pay only if appropriately licensed and qualified medical professionals are providing care? I mean, is this just all part of the guild and we should ignore all of these qualification requirements, whether it's for doctors or nurses or LPNs or anybody else? No, Your Honor. As we indicated in our brief, we think this is a very individualized accommodation request from Ms. Vaughn to say, I would like to have my care provided by unskilled caregivers so that I can go home. And here is evidence from my physician that says that I can have people who are trained to do the things that I need to do through nurse delegation. And in fact, the state earlier this year or in the late fall submitted a waiver request to the A&D waiver in question in this case to actually allow nurse delegation to occur, and that was also in our brief. So I don't think it's, you know, certainly for a lot of people, they would not want unskilled caregivers to be providing their care, and that is something that should not be ever forced on anybody. But Ms. Vaughn is saying, if it will help me go home, I can train people to provide my care. Okay. And so I just wanted to quickly address a point I think that was raised earlier about I just wanted to briefly explain that, and we cited this in our brief, that other states do this in terms of they allow unskilled caregivers to provide more sort of traditionally skilled care, and they do it oftentimes by making that a separate classification or in the service realm. States of Indiana certainly do that, and they don't have to. But there are multiple ways in which you can allow unskilled caregivers to meet the need. So what if the injunction, what if instead of this injunction, the injunction just said the state isn't joined to permit Ms. Vaughn to use unskilled caregivers? Would that be enough? I think it certainly is an injunction that could have come out of this case, but I will also go back to the district court sort of description of what she was enjoining, which was the failure to provide home and community-based services to Ms. Vaughn in violation of Homestead. And so that in some ways I think the state might be arguing that that is too specific and encroaches upon its state authority to work with its own program, that that would violate the policies of federalism and other issues. I think that the district court, as she indicated in the order for the injunction, she was walking a narrow line. The state had already said no to an injunction that was similar to this court's injunction in OB versus Norwood, said that that was too, that was not acceptable. And they had said no to many other ideas from Ms. Vaughn, but had submitted no ideas of their own. And so I think the court was walking a narrow line in trying to protect the state's interests and their institutional authority to understand their own programs, and at the same time, correct the wrong done to Ms. Vaughn by her unnecessary institutionalization. Okay. You're down to your last half minute, so if you'd like to wrap up, that would be good. Yes, Your Honor. Really here, the state, the wrong done to Ms. Vaughn is her unnecessary institutionalization. And the state failed in its affirmative obligations to help her receive the services in her own home. This is not about amount of services or anything else, as the court in Radishevsky identified that when the question is about location of services, Olmstead controls them here, she's asking for services in her own home. Many of the things that the state is complaining about are its own choices, and as the court said, the state cannot paint itself in the corner and then lament the view. So we ask that this court decision be affirmed. All right. Great. Thank you very much. Anything further, Mr. Hudson? Yes, just two things, Your Honor. First, I'd like to give you an answer to your question about Medicare. So Ms. Vaughn will be dually eligible for Medicaid and Medicare once she becomes eligible for Medicare, but Medicare has limitations on long-term care coverage, so it is likely that Medicaid would be the principle mechanism by which she would receive long-term care even once she becomes eligible for Medicare. And then point two, and more importantly, the district court's injunction threatens the integrity of the state's rate-setting process. This court appropriately recognized in OB that Armstrong stands for the proposition that the Medicaid Act, by providing a judgment-laden and complex rate-setting procedure, bars federal courts from interfering in the rate-setting process. And that's precisely what the district court's injunction does here. And whether a court orders the state to raise its Medicaid rates and use Medicaid funds to pay more for a service, whether it orders the state to use general funds, or whether it orders the state to use special purpose funds like the Choice Program, any one of those orders is effectively requiring the state to pay providers more than what the state and the federal government have jointly agreed is the appropriate rate. And because the district court's order requires precisely that, it's unlawful. For these reasons, the state asks that this court reverse the district court's injunction. All right, thank you very much. Thanks to both counsel. The court will take this case under advisement.